Filed
3/26/2026 8:29 AM
Anne Lorentzen
District Clerk
Nueces County, Texas

# IN THE COUNTY COURT AT LAW
## NUMBER _____ OF NUECES COUNTY, TEXAS

| | | |
|---|---|---|
| LETICIA ROBERTS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Case No.   2026CCV-60425-1 |
| | § | |
| GOVERNMENT SOFTWARE ASSURANCE | § | |
| CORPORATION d/b/a GSA CORP., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Leticia Roberts files this Original Petition against Defendant Government Software Assurance Corporation d/b/a GSA Corp., and shows as follows:

## DISCOVERY CONTROL PLAN

1. Discovery in this case is intended to be conducted under Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

## PLAN

2. Plaintiff Leticia Roberts is an individual who resides in Nueces County, Texas.

3. Defendant   Government Software Assurance Corporation d/b/a GSA Corp. ("Defendant" or "GSA Corp.") is a Florida corporation with its principal place of business at 1276 Minnesota Avenue, Winter Park, Florida 32789. GSA Corp. may be served with process by personal through its CEO, Larry Zirbel, at the above address, or

**Exhibit 1.2**

Copy from re:SearchTX

through any registered agent for service in Texas. GSA Corp. has purposefully availed itself of the privilege of conducting business in Texas and has the requisite minimum contacts with this State and this County such that the exercise of jurisdiction over it by this Court does not offend traditional notions of fair play and substantial justice.

## JURISDICTION AND VENUE

4.    This Court has subject-matter jurisdiction over this controversy because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

5.    Venue is proper in Nueces County, Texas, pursuant to Texas Civil Practice and Remedies Code § 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Nueces County. Specifically, Defendant's knowingly false and defamatory letter was transmitted directly to the Nueces County Appraisal District Board of Directors in Corpus Christi, Texas; the Request for Proposals (RFP) process that Defendant sought to undermine concerned a contract to be performed in Nueces County; Plaintiff's employment relationship with the Nueces County Appraisal District was centered in Corpus Christi; and all of the damages suffered by Plaintiff were sustained in Nueces County.

## FACTS

6.    For more than seventeen years, Leticia Roberts served the Nueces County Appraisal District ("NCAD") with distinction, rising to the position of Assistant Chief Appraiser. She was a trusted public servant responsible for ensuring fair and accurate property valuations for the citizens of Nueces County.

2

Copy from re:SearchTX

7.    In late 2024 and early 2025, NCAD issued an RFP for a new Computer-Assisted Mass Appraisal ("CAMA") software system. Ms. Roberts was one of five members of an impartial evaluation committee charged with reviewing all vendor proposals, including those submitted by Defendant GSA Corp and its competitor, True Prodigy. The committee applied the objective criteria set forth in the RFP, conducted a thorough and transparent evaluation, and ultimately recommended True Prodigy as the vendor best suited to meet NCAD's needs. That recommendation was presented to NCAD's Board of Directors on February 12, 2025.

8.    Unhappy with the committee's recommendation, Defendant GSA Corp launched a retaliatory campaign to discredit Ms. Roberts and derail the process. On February 13, 2025, Shannon Davis, GSA Corp's Executive Vice President, authored and sent a complaint letter (the "GSA Letter") directly to NCAD Board Chairman Kevin Kieschnick. A true and correct copy of the GSA Letter is attached as Exhibit A.

9.    The GSA Letter contained numerous knowingly false and inflammatory accusations. It falsely claimed that Ms. Roberts and other NCAD staff had engaged in "bid rigging," manipulated RFP scoring criteria to eliminate GSA, shown undue favoritism toward True Prodigy, made false statements about GSA's product, and attempted to conceal information from the Board. These accusations were supposedly based on an alleged "open mic" incident during a Microsoft Teams call on February 7, 2025. In reality, GSA representatives deliberately remained silent on the call for more than two hours—long after they realized Ms. Roberts was not actively participating—

3

Copy from re:SearchTX

while eavesdropping on a private, internal conversation. They did not announce their presence, even after they suspected the discussion included legal counsel, thereby intruding upon what they knew or should have known was protected attorney-client communication.

10.     The GSA Letter was not a good-faith protest; it was a calculated smear designed to pressure NCAD into reversing its recommendation. It expressly urged the Board to share the letter with NCAD staff and to hold individuals "accountable" for the purported misconduct.

11.     In response to the GSA Letter, NCAD placed Ms. Roberts and the Chief Appraiser on administrative leave and commissioned an independent investigation by a reputable San Antonio law firm. That investigation exhaustively reviewed the RFP process, scoring methodologies, and all related communications. It concluded that neither Ms. Roberts nor any other NCAD personnel had engaged in any wrongdoing whatsoever. A true and correct copy of Ms. Roberts' contemporaneous notes responding to the GSA Letter's false accusations is attached as Exhibit B.

12.     Despite the complete exoneration, the reputational damage inflicted by Defendant's false accusations was irreversible. The public nature of the GSA Letter, its inflammatory language, and Defendant's demand for "accountability" created an intolerable environment. Ms. Roberts was ultimately forced to separate from her long-term employment at NCAD, suffering profound professional, financial, and emotional harm.

Copy from re:SearchTX

13.   Defendant's actions were not accidental. GSA knew the allegations were unfounded yet disseminated them anyway, with the specific intent of disrupting Ms. Roberts' employment relationship and derailing the RFP outcome.

## CAUSE OF ACTION

### COUNT 1 – TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP

14.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

15.   Under Texas law, a claim for tortious interference with an employment relationship requires proof of: (1) the existence of an employment relationship subject to interference; (2) a willful and intentional act of interference by the defendant; (3) proximate causation; and (4) actual damages or loss. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 664 (Tex. 1990); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989). The terminable-at-will status of an employment relationship is no defense to such a claim.

16.   First, Ms. Roberts maintained a long-standing, protected employment relationship with NCAD.

17.   Second, Defendant committed a willful and intentional act of interference by authoring and transmitting the GSA Letter containing numerous false statements—accusations of score manipulation, bid rigging, favoritism, and concealment—knowing they were baseless and with the express intent of prompting "consequences" and "accountability" for Ms. Roberts.

5

Copy from re:SearchTX

18.    Third, Defendant's conduct was the proximate cause of Ms. Roberts' forced separation. But for the GSA Letter, the independent investigation would never have been necessary, and Ms. Roberts would have continued her exemplary career at NCAD.

19.    Fourth, Plaintiff has suffered, and continues to suffer, substantial actual damages as a direct and proximate result of Defendant's interference.

**COUNT 2 – DEFAMATION (LIBEL)**

20.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

21.    Under Texas law, a claim for defamation requires proof of: (1) the publication of a false statement of fact to a third person; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault; and (4) that caused damages. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). When the statements impute unfitness for one's profession or charge the commission of a crime, they are defamatory *per se*, and damages are presumed. *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013).

22.    Defendant published the GSA Letter containing multiple false statements of fact about Ms. Roberts, including that she:

- engaged in "bid rigging";

- manipulated RFP scoring criteria to eliminate GSA;

- expressed undue favoritism toward True Prodigy;

- made false statements about GSA's product; and

- attempted to conceal information from the Board.

23.    These accusations were objectively false, as confirmed by the independent

6

Copy from re:SearchTX

investigation that found no wrongdoing whatsoever by Ms. Roberts or any NCAD personnel.

24.    The GSA Letter was published to third persons, including NCAD Board Chairman Kevin Kieschnick, and was expressly intended to be (and was) shared with other Board members and NCAD staff.

25.    The statements were defamatory *per se* because they directly impeached Ms. Roberts' honesty, integrity, and fitness to serve as a public official and Assistant Chief Appraiser.

26.    Defendant acted with actual malice. GSA knew the statements were false when made, or acted with reckless disregard for their truth, because: (a) the accusations were based on a deliberately eavesdropped private conversation that GSA itself admitted it had no right to hear; (b) GSA had full access to the RFP responses, scoring sheets, and committee deliberations yet chose to fabricate claims of manipulation; and (c) the letter was sent for the sole purpose of discrediting Ms. Roberts and reversing the committee's recommendation.

27.    As a direct and proximate result of the defamation, Plaintiff has suffered substantial damages, including reputational harm, humiliation, anxiety, loss of professional standing in the appraisal community, and economic losses from her forced separation.

## DAMAGES

28.    As a direct and proximate result of Defendant's tortious interference, Plaintiff has

7

Copy from re:SearchTX

sustained the following damages:

a. Economic damages of approximately $750,000, including lost wages, lost benefits, lost retirement contributions, and diminished future earning capacity in her specialized field;

b. Non-economic damages of approximately $750,000 for mental anguish, reputational harm, humiliation, anxiety, and loss of professional standing within the appraisal community; and

c. Costs and attorney's fees of approximately $250,000 incurred in defending against Defendant's false accusations and prosecuting this action.

29.    Plaintiff further seeks exemplary damages because Defendant's conduct was malicious, reckless, and in conscious disregard of Plaintiff's rights. Defendant knowingly published false accusations, deliberately eavesdropped on a private conversation (including suspected attorney-client communications), and intended to destroy Plaintiff's career for its own commercial gain. Exemplary damages are necessary to deter such outrageous and unethical business practices.

## CONDITIONS PRECEDENT

30.    All conditions precedent to Plaintiff's claims have been performed, have occurred, or have been waived.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Leticia Roberts respectfully prays that Defendant Government Software Assurance Corporation d/b/a GSA Corp. be

8

Copy from re:SearchTX

Corp. be cited to appear and answer herein, that upon final trial Plaintiff recover judgment against Defendant for:

- actual damages in excess of the minimum jurisdictional limits of this Court;

- exemplary damages;

- pre- and post-judgment interest at the maximum lawful rate;

- court costs; and

- such other and further relief, both general and special, at law or in equity, to which Plaintiff may show herself justly entitled.

**Plaintiff demands a trial by jury**.

Respectfully submitted,

B R O O K S   L L P

s/Jon D. Brooks
Jon D. Brooks
Attorney-in-Charge
State Bar No. 24004563
5350 S. Staples St., Suite 444
Corpus Christi, Texas 78411
361.885.7710
361.885.7716 (facsimile)
jbrooks@brooksllp.com

**Attorney for Plaintiff Leticia Roberts**

9

Copy from re:SearchTX



*Better Products, Better Service, Expect Results*

To:      Kevin Kieschnick,  Chairman of the Nueces CAD Board
From:   Shannon Davis, Executive Vice President, GSA Corp
Date:   2/13/25
RE:      Nueces CAD RFP

Kevin,

I appreciate you taking the time to speak to me this morning. Following I have outlined details of the open mic event that I reported and other concerns regarding the Nueces County Appraisal District CAMA RFP. I encourage you to share this with other Board Members and Nueces County Appraisal District staff.

**Open Mic Event**
On Friday February 7th, around approximately 11:15 am CST Wendy Grams received a call from Leticia Roberts requesting clarifications to the RFP. I had suspected for some time, based on behaviors and prior conversations with Ms. Roberts, that these calls were simply attempts to collect information to endeavor to remove us from consideration. Consequently, I instructed Ms. Grams not to engage in calls without me present. During this instance, I was in an alternate meeting at the time. I asked if we could speak at 12 pm CST. Ms. Roberts indicated that noon would be too late and pressed for an immediate conversation.

Ms. Grams set up a TEAMS call, inviting me and Ms. Roberts and I said I would join as quickly as possible. Approximately 20 minutes later I joined, and Ms. Grams and Ms. Roberts were already logged on. I began speaking to Ms. Roberts, but she did not respond. Initially we believed her microphone was not engaged as we had this challenge with her on TEAMS previously. I messaged in chat that we could not hear her, and did not know if she could hear us. After several minutes of no response, I came to realize she must have stepped away from her desk waiting for me to join. Ms. Grams muted her line and placed three separate calls to the front desk at the Appraisal District requesting that someone attempt to locate Ms. Roberts to let her know that we were waiting in the meeting invite she had accepted.

Approximately 20 additional minutes later, Ms. Roberts returned to her office with whom we believe to be Irma Vera although never identified by name. Immediately, the two began discussing how to manipulate the RFP scoring criteria to eliminate GSA from the award and their preference for True Prodigy. Their discussion continued for more than an hour. They did not discuss any other vendor responses or their scores for the entire duration. The conversation was them brainstorming possible loopholes in the RFP or how they could manipulate the scoring methodology so that GSA was not the highest scoring participant. The conversation was incredibly in depth and undeniably intentioned.

The tactics they seemed to be most focused on were altering the scoring requirements themselves, for example awarding partial points for yes/no questions instead of full points, editing the requirements themselves and using generic RFP stipulations granting the committee the right to choose what was best for the District.

Ms. Roberts was also using false statements speaking with Ms. Vera during the call to justify her desire to choose True Prodigy including that our proposed solution for Texas is not the same as other

1 of 4

Copy from re:SearchTX



**Better Products, Better Service, Expect Results**

states (which is false) that we are not compliant with Texas Legislation (also false) and that our system is not a "total solution". Ms. Roberts has never made any attempt to discuss these concerns with any GSA staff. It appeared she was willing to make up any necessary statements to support her position.

The two made several concerning comments including criticizing Neil Lindeen for not falling in line and "being a team player." They also lamented that they were worried Neil would "talk to his wife, who would then talk to Kevin, and Kevin would cause problems at the meeting by asking questions." We later realized that Mr. Lindeen's wife is employed at the tax office and the "Kevin" to whom they were referring was you, the Tax Assessor Collector and CAD BOD Chairman. It appeared they were hoping to withhold details from the review process and the Board's consideration. Pettily, they also resorted to name calling, labeling Ms. Grams a "liar" multiple times and referring to either Mr. Lindeen or another staff member as "Papa Smurf," also multiple times.

The two main scoring criteria they focused on were written as follows in the RFP:

1. Has the proposed solution been implemented in an appraisal district with 200,000 or more parcels in Texas (15%)
2. Has an appraisal district used the proposed solution to finish three or more appraisal cycles (10%)

At some point, another woman joined the conversation, we believe to be Counsel Belinda Hinojosa-Persohn as we believe they referred to her by her first name. It seemed she was mostly advising them against trying to alter the parameters of the scoring criteria for items 1 and 2 above after the fact and seemed to counsel them against ostracizing Mr. Lindeen for his unwillingness to "fall in line".

Ultimately, they did manipulate the criteria for both scoring criteria, awarding GSA 0 points for each. For #1, they remove minerals accounts from the parcel count and for #2, they added the criteria of "in Texas" to the requirement. Ector CAD has 248,182 parcels, and we have finished 8 full appraisal cycles on this product proposed. Exceeding both original requirements. I have no idea if counsel changed her mind, they ignored her advice or they sought advice from another party that agreed to allow it.

Eventually the three parties realized the TEAMS meeting app was open on Ms. Roberts computer, and after attempting to determine if we were present, they disconnected the call.

Ms. Grams and I consciously chose not to disclose the following event live at the Board meeting as County Appraisal Districts are our colleagues and community. Disclosing this information in that forum would make this issue very public and potentially embarrassing, which is not our intent. We had genuinely hoped that the parties involved would have reconsidered before presenting at the meeting, especially in light of the fact that they knew there was a possibility that we had heard their entire conversation. We do however believe that there should be consequences for rigging this bid, and hope the Board will hold these individuals accountable.

To remove any doubt that this open mic event did in fact occur, below is a screen capture from TEAMS app in EST that illustrates the meeting start time, end time, our attempts to alert Ms. Roberts initially that we could not hear her, and then nearly two hours later, her trying to determine if we were present.

2 of 4

Copy from re:SearchTX



**Better Products, Better Service, Expect Results**



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Board Presentation Concerns or Inaccuracies

Below, I have also outlined some examples of questionable or inaccurate statements in the Board presentation and RFP process. I can't speak to whether inaccuracies were an effort to misrepresent information or are simply due to ignorance on Ms. Roberts part as she did seem to struggle with technical and financial specifics.

1. The RFP technical specifications, which she referred to as General software Design, CAD Operational, Mass Appraisal and Performance, are an exact copy of the Tarrant technical specifications scored just months ago. In this case the scores were True Prodigy 1,102 and GSA at 1,245. The higher the score, the more required features in the list that were already implemented in the CAMA system. There was more than a 10% gap in our favor. We were not shown the scorecard, but I believe Ms. Roberts said that True Prodigy scored higher, but the scores were "close". There simply has not been enough time to bridge this development gap as some items are a significant endeavor. I believe the score is either inaccurate, manipulated or misrepresented.

2. Both Leticia Roberts and Ronnie Canales shared opinions or perspectives about our software and/or how True Prodigy is a better solution for their office, however neither had any meaningful exposure to our product. We demoed at the CAD for a full day, 9a-4p to approximately 12 individuals. The committee were the ones selecting the software, and only 3 of the 5 members had limited or no attendance at all.
   a) Ronnie Canales, did not attend our demo
   b) Leticia Roberts, was in and out, present for less than an hour.
   c) Irma Vera, did not attend our demo at all.
   d) Neil Lindeen, attended the demo in full.
   e) Chris Burnett, attended the demo in full

3. Most demo attendees were department managers, and several asserted to us that our software was the best they had seen. Sadly, her presentation did not include feedback from those managers.

Copy from re:SearchTX



4.  Based on hearing Ms. Roberts speak about the pricing, I do not believe she has a clear grasp on the total cost of ownership for CAMA over 5/10/15 years. For example, she was mixing up which costs are fixed vs. which are annual subscriptions. I would encourage a review of those figures.

5.  I also do not believe she is capturing hidden costs for example it is standard for other CAMA vendors to cap customer service requests, including True Prodigy. Typically, this cap is at 7 help desk tickets per year as seen in sample contracts. This would be a significant additional expense for a county the size of Nueces. We can provide samples of these contracts upon request.

6.  She does not understand what "access" to data, databases, and tables "means," and the consequences of not having it. She used several incorrect words when describing this concept and odd proclamation that a CAD recently expressed, they don't have access but don't need it (in an excited tone).

7.  She made several statements such as "GSA is new to Texas," "we didn't' have everything built in" or that we "aren't Texas compliant", "we don't' have experience converting out of PACS". These are broad and inaccurate statements, and it was very frustrating that we were not given an opportunity to dispute them.

8.  Staff only conducted one site visit to a True Prodigy client, we do not believe this was due to it being more convenient as they insisted in the meeting.

9.  When debating whether Ector CAD qualified as a 200,000-parcel account, she attempted to make me appear unresponsive to her efforts to clarify. She had only sent me the request the day before and I was traveling in for the meeting. I noticed that she made other comments, specifically about Mr. Lindeen, that were also attempts to gaslight. I venture to guess this is common practice.

10. Finally, when Mr. Lindeen expressed that he felt there were efforts behind the scenes to manipulate the process and that the scores were not what he had previously discussed with Ms. Roberts, I was disappointed that Ms. Persohn did not disclose that she was a party to the open mic conversation in which Ms. Roberts and Ms. Vera were in fact attempting to manipulate the scores. Unfortunately, she let the board dismiss his concerns and put him in a very precarious and embarrassing position, vulnerable to retribution.

----

**Disclosure**

This complaint is not accusing True Prodigy of wrongdoing. We have no evidence from the open mic event nor our exposure to staff during demos and RFP to suggest that they were a party to bid rigging.

----

Thank you again for your consideration,

Respectfully,

Shannon Davis
Executive Vice President
GSA Corp

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jon Brooks on behalf of Jon Brooks
Bar No. 24004563
jbrooks@brooksllp.com
Envelope ID: 112941185
Filing Code Description: Petition
Filing Description: Plaintiff's Original Petition
Status as of 3/27/2026 9:24 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jon DBrooks | | jbrooks@brooksllp.com | 3/27/2026 8:57:05 AM | NOT SENT |

Copy from re:SearchTX